**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

| | |
|---|---|
| **U.S. All Star Federation, Inc.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 6:21-cv-02135-WBB-DCI** |
| **Open Cheer & Dance Championship Series, LLC, et al.** | |
| **Defendants.** | |

**DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND RELATED**
**NONTAXABLE EXPENSES AND MEMORANDUM OF LAW IN SUPPORT**

Following the Court's order granting Defendants[1] summary judgment on Plaintiff U.S. All Star Federation's claims (Doc. 221, the "SJ Order"), Defendants now respectfully move for: (1) an order that they are entitled to their reasonable attorneys' fees and related nontaxable expenses incurred as a result of successfully defending this action under 15 U.S.C. § 1117(a), the Court's inherent power, and Fed. R. Civ. P. 54(d); and (2) permission to file a fee application setting forth and supporting the amount and reasonableness of their fees and expenses. This motion is filed within 14 days of judgment being entered.

**Introduction[2]**

By any measure, this trademark case is "exceptional." That is, it "stands out from others." Plaintiff filed this lawsuit for an anti-competitive purpose, with Plaintiff's real

---

[1] "Defendants" are collectively Open Cheer & Dance Championship Series, LLC ("Open Series"), The Open Cheer and Dance, LLC ("Open Cheer"), David Owens, Heidi Weber, Jeb Harris, and David Hanbery.

[2] Given the volume of briefing already before the Court, including Defendants' motion for summary judgment and accompanying evidence, Defendants will try to avoid repeating the basic facts and procedural history of this case. Defendants ask the Court to take judicial notice of the file in this case.

complaint being that there was a new competitor awarding a world championship. Plaintiff suing Defendants as a competitive ploy makes this case stand out without more.

But there is more. Plaintiff's claims were substantively meritless, which also makes this an exceptional case. Lacking a protectible mark, sufficient evidence of secondary meaning or actual confusion, or any lost sales, Plaintiff still pressed the absurd argument that Open Cheer should not be allowed to use the generic terms "world" or "world championship" to identify a world championship. After improvidently filing this case for an improper purpose with baseless claims, Plaintiff then pursued it for years in an excessively costly and contentious manner. Exploitation of the legal system for anti-competitive ends should not be tolerated. Thus, Defendants ask that they be awarded their reasonable attorneys' fees and related nontaxable expenses. Upon the granting of this Motion, Defendants will submit a fee application setting forth and supporting their calculations of those fees and expenses and their reasonableness.

## Argument

Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). An "exceptional" case "is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 554 (2014). *Either* may independently support an award of attorneys' fees. *See, e.g., Florida Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.,* 2017 WL 3610583, at *6 (S.D. Fla. Aug. 11, 2017) (awarding fees to prevailing defendant).

*Octane Fitness* lowered the requisite evidentiary standard for proving an "exceptional case." *Tobinick v. Novella*, 884 F.3d 1110, 1113 (11th Cir. 2018) (applying *Octane* to Lanham Act cases and affirming award of defendant's fees after summary judgment). Now "a case need not be 'groundless, unreasonable, vexatious' or 'pursued in bad faith,' to be 'exceptional.'" *Pocket Plus, LLC v. Runner's High, LLC*, 579 F. Supp. 3d 1082, 1088 (N.D. Iowa 2022), aff'd sub nom. *Pocket Plus, LLC v. Pike Brands, LLC*, 53 F.4th 425 (8th Cir. 2022); *Hunter Residential Services, LLC v. AAA Randpro Plumbing, Inc.*, No. 816CV01311CEHTGW, 2017 WL 1987247, at *6 (M.D. Fla. Feb. 21, 2017). Even if a plaintiff's cause has some merit, it still may be proper to award a defendant attorneys' fees. *Renna v. Cnty. of Union, N.J.*, No. 2:11-3328 KM MAH, 2015 WL 1815498, at *3 (D.N.J. Apr. 21, 2015) (awarding fees even if case had "a sliver of merit"). In deciding whether to award fees, courts may consider the totality of the circumstances and a wide variety of factors. *Octane Fitness,* 572 U.S. at 554. There is no precise formula. *Id.* The standard of proof is a preponderance of the evidence. *Id.* at 557.

If a case is exceptional under the Lanham Act, prevailing defendants are routinely awarded their attorneys' fees. *See, e.g., Warren Tech., Inc. v. UL LLC*, No. 21-11168, 2021 WL 4940833, at *3 (11th Cir. Oct. 22, 2021); *Donut Joe's, Inc. v. Interveston Food Services, LLC*, 116 F. Supp. 3d 1290, 1293 (N.D. Ala. 2015). This case is exceptional.

**1. Plaintiff's claims were exceptionally weak and objectively unreasonable.**

At the outset, this case stands out due to the strength of Defendants' litigating position and Plaintiffs' extremely weak claims. *See Pro Video Instruments, LLC v. Thor Fiber, Inc.*, No. 618CV1823ORL31LRH, 2021 WL 487020, at *3-5 (M.D. Fla. Feb. 10, 2021) (exceptional case because substantive strength of plaintiff's position was exceptionally

weak; suggestive marks but dearth of evidence showing confusion and flawed survey). That Plaintiff chose to gamble with objectively unreasonable claims supports an award of Defendants' attorneys' fees. *See Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 6:18-CV-576-JA-DCI, 2022 WL 19479011, at *4 (M.D. Fla. Nov. 4, 2022) (Irick, J.) (awarding fees after granting summary judgment when plaintiff chose to gamble on surviving summary judgment despite weak Lanham Act claim).

As the Court's summary judgment confirmed, Plaintiff's claims failed at the start because its marks are generic. Plaintiff's witnesses effectively conceded that the marks identify what the event is, rather than who offers it. *See* Doc. 170-3 at 430-31 (Q: [W]ould you agree with me that the Cheerleading Worlds, the name of it, is describing the nature of the event that it is, a world championship? A: Yes.); Doc. 170-3 at 36 (Q: [I]t describes the service being provided, correct? A: Yes.). Even so, Plaintiff chose to press forward in an ill-advised effort to keep its monopoly and block a competitor from entering the market. That Plaintiff sued for more than $40 million in damages without being able to show its marks are at least descriptive makes this case exceptional. Yet, even if the marks were descriptive, the claims still suffered many flaws that should have given Plaintiff pause.

### A. Plaintiff found no compelling evidence of trademark confusion.

First, Plaintiff had no compelling evidence of consumer confusion stemming from Defendants' alleged use of "Allstar World Championship" or "Allstar Worlds." (The Allstar World Championship will be called "ASWC"). Notwithstanding over a dozen depositions taken, thousands of documents produced, and more than 40 subpoenas to third parties, Plaintiff found no sufficient evidence of *trademark* confusion caused by Defendants' alleged infringement (versus another non-trademark-related reason, such as why

someone else was able to host a world championship competition when Plaintiff barred members from hosting one). That Plaintiff lacked such evidence reveals the objectively baseless nature of its claims. *Pro Video Instruments, LLC*, 2021 WL 487020, at *4.

Despite Plaintiff demanding more than $40 million from Defendants and over 35,000 attendees at the competitions each year, Plaintiff's 30(b)(6) deposition confirmed that Plaintiff had no evidence of any instance in which:

- an athlete, parent, or spectator attended the ASWC (or a qualifying event) because they believed it was associated with or connected with Plaintiff or The Cheerleading Worlds (Ex. 1 at 49:9-18; 53:1-54:5; *see also* Ex. 2 at 117:1-20);

- an athlete, parent, or spectator attended The Cheerleading Worlds or the ASWC believing it was the other event (Ex. 1 at 49:9– 51:5);

- a gym or team accepted a bid to the ASWC because the gym mistakenly believed it was a bid to The Cheerleading Worlds (Ex. 1 at 53:1-14); or

- someone bought apparel or merchandise for the ASWC believing that it was associated with Plaintiff or The Cheerleading Worlds. (Ex. 1 at 54:8-14).[3]

Plaintiff's total disregard for these deficiencies render this case "exceptional." For example, in *Florida Int'l Univ. Bd. of Trustees*, the court explained that the plaintiff "litigated the case in an unreasonable manner" when it "litigated the case with only *de minimis* evidence of actual confusion," and "there was never a single known instance during the application process where a prospective student applied for admission to either FNU or

---

[3] Although a plaintiff need not show actual confusion to prevail, Plaintiff's inability to identify even a single instance of a lost sale since the ASWC was announced over three years ago creates a presumption *against* likelihood of confusion in the future. *See Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 95 (4th Cir. 1997) (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)).

FIU under the impression that FNU was associated with FIU, and there was not a single dollar of tuition that had been misdirected as a result of FNU's mark." 2017 WL 3610583, at *7. Just like that case, Plaintiff unreasonably litigated this case with, at most, *de minimis* evidence of actual confusion, and there was never a single known instance where a prospective athlete, team, gym, or spectator attended the ASWC under the impression that the ASWC was associated with Plaintiff. Not one dollar was shown to have been misdirected as a result of the allegedly infringing marks. Thus, even if Plaintiff's lawsuit were not baseless when it was filed (it was), Plaintiff should have realized as discovery progressed that its claims were objectively unreasonable. *Id.* ("Plaintiff failed to re-evaluate the strength of its case as discovery continued").

### B.  Plaintiff's case rested on hearsay, speculation, and conjecture.

Lacking any hard proof, Plaintiff clung to shaky "evidence" to prove confusion (Doc. 182-1 at 16-17): (1) a single photo of an unknown woman, taken by an unknown person, on an unknown date showing no *trademark* confusion (Ex. 1 at 80:17– 83:10); (2) a single purported screenshot of a social media post made by an unknown person on an unknown platform even though Plaintiff's 30(b)(6) witness had no idea why it was being offered (Ex. 1 at 83:11– 84:1: "I don't see any reason why this one would be confusing, because it clearly states the Open Championship All Star Worlds"); (3) a friend of Plaintiff's Vice President and wife, who wasn't confused herself (Ex. 1 at 72:2– 73:7; Doc. 158 a 7 n.6), speculating that other people were initially confused[4]; (4) a few allegedly misdirected

---

[4] The friend's opinion carries no weight here. *Valador, Inc. v. HTC Corp.*, 241 F. Supp. 3d 650, 669 (E.D. Va. 2017), aff'd, 707 Fed. Appx. 138 (4th Cir. 2017) (granting defendants summary judgment: "Needless to say, the single opinion regarding actual confusion from a plaintiff-insider who happens to be the CEO's friend (but has never been one of plaintiff's consumers) carries no weight here.").

phone calls,[5] even though Plaintiff had no testimony from these callers and lacked compelling evidence showing the callers were relevant consumers experiencing trademark-related confusion; (5) alleged screenshots of a purported chat room provided by an unknown source, located on an unknown platform, involving alleged messages sent by unknown third parties, which Plaintiff's 30(b)(6) witness knew nothing about (Ex. 1 at 69:1– 70:21); and (6) supposed "other" evidence of confusion, which Plaintiff failed to explain in any compelling way.[6] In all, Plaintiff mustered no more than hearsay, speculation, and conjecture even after sending more than 40 subpoenas. Ex. 3-C.

Plaintiff also pressed its preposterous argument that Defendants were using the allegedly infringing marks in bad faith to confuse consumers, even though the ASWC was clearly being offered as an entirely new option in the market separate from Plaintiff and Varsity. Plaintiff ignored that the ASWC consistently included other brand indicia, such as Open Cheer's logo with the full name of "Open Championship Series." *Girl Scouts of the United States of Am. v. Boy Scouts of Am.*, 597 F. Supp. 3d 581, 600 (S.D.N.Y. 2022) (brand indicia weighs against similarity). Plaintiff's Complaint also remarkably sought an order that Defendants cannot use the word "world" for an all star world championship.

---

[5] The only alleged caller Defendants managed to reach (Amie Allen) confirmed she was not confused—she didn't know what the USASF was and merely tried calling whatever phone numbers she could find online while looking for tickets. Ex. 3 ¶ 6-8. In addition, the few calls cited could not create a genuine issue of fact, especially when Plaintiff constantly receives calls about its affiliation with other events. *See* Doc. 170-1 at 20; *Duluth News-Tribune, a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) (affirming summary judgment; misdirected calls reported by seven witnesses in case discounted when no opportunity for cross-examination of caller and, if anything, merely showed inattention on part of the caller).

[6] Again, no affidavits from relevant, unbiased consumers in the industry described any confusion. Plaintiff failed to point to competent summary-judgment evidence (or anything that would be admissible a trial) and explain how it showed trademark confusion.

This relief was particularly overreaching given Plaintiff's disingenuous assertion of protectible rights in the words "cheerleading" and "worlds" when it (or its predecessor) had disclaimed any exclusive right to use such words. Doc. 170-1 at 7-8.

Likewise, Plaintiff lacked competent evidence proving secondary meaning. After years of litigation, Plaintiff merely gathered general, self-serving statements from its own officers, partners, and employees (plus one friend of its Vice President), none of which could satisfy Plaintiff's heightened burden of showing secondary meaning.[7] That Plaintiff had no affidavits from relevant consumers showing secondary meaning or confusion confirms the absence of such evidence. *See Olem Shoe Corp. v. Wash. Shoe Co.*, No. 09-23494-CIV, 2011 WL 6202282, at *21 (S.D. Fla. Dec. 1, 2011), aff'd sub nom. *Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 Fed. Appx. 873 (11th Cir. 2015) (no testimony explaining statements allegedly showing secondary meaning nor how many consumers made such statements; that plaintiff "does not have more convincing evidence to show actual identification is the best evidence of its absence").

### C.  Plaintiff had no survey or other quantifiable proof.

The lack of proof discussed above is enough to make this case exceptional. But there is more that shows Plaintiff's claims were unreasonable. Although surveys are not required, the absence of a survey highlights another huge flaw with Plaintiff's claims, especially when Plaintiff received Defendants' surveys showing no secondary meaning

---

[7] *Tartell v. S. Florida Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1258 (11th Cir. 2015) (generalized self-serving statements add no material evidence relevant to secondary-meaning inquiry); *Pride Family Brands, Inc. v. Carl's Patio, Inc.*, No. 12-21783-CIV, 2014 WL 347040, at *4 n. 13 (S.D. Fla. Jan. 30, 2014) (plaintiff's own impressions are non-probative of public mind); *RV Horizons, Inc. v. Smith*, No. 18-CV-02780-NYW, 2020 WL 6701119, at *15 (D. Colo. Nov. 13, 2020) (affidavits of employees or close affiliates carry *de minimis* evidentiary weight and cannot defeat a motion for summary judgment).

or confusion. *See Brown v. Quiniou*, 744 F. Supp. 463, 470 (S.D.N.Y. 1990) ("[W]here the other evidence of consumer recognition is hardly overwhelming, the absence of survey evidence weighs heavily against plaintiffs' position.").

For example, in *Vital Pharm., Inc. v. Am. Body Bldg. Products, LLC*, the court awarded attorneys' fees to the prevailing defendant in a trademark infringement action when the plaintiff chose not to present any survey evidence. 510 F. Supp. 2d 1043, 1049 n.4 (S.D. Fla. 2007) ("[I]n the absence of survey evidence, a Plaintiff must have other compelling evidence proving secondary meaning, none of which appeared in this case."). While the plaintiff offered evidence of extensive advertising, it had no evidence demonstrating the effectiveness of its advertising on the minds of consumers, noting that the only witnesses on the issue were clearly biased. *Id.* In addition, to prove a likelihood of confusion, the plaintiff offered the testimony of a close friend of its CEO, whose testimony revealed that he was not confused. *Id.* at 1051. As a result, it was apparent to the court that the plaintiff's motivation in bringing suit was to use the Lanham Act as a tool to stifle legitimate competition and create a monopoly over the sale of certain products. *Id.* at 1051-52 (adding that the plaintiff tried to change claims in response to motion for summary judgment).  That the plaintiff chose to proceed with costly litigation amid insufficient evidence constituted bad faith, entitling the defendants to attorneys' fees. *Id.* at 1052.

Like *Vital Pharm., Inc.*, Plaintiff pressed forward with costly litigation despite a dearth of evidence. Even though Plaintiff is a large corporation represented by one of the largest and most prestigious law firms in the United States, it never tried to obtain survey evidence to show secondary meaning or a likelihood of confusion, which weighed heavily

against its chances of success.[8] (Or, perhaps, Plaintiff tried, but did not get the results it wanted). Nor did Plaintiff conduct any formal research before suing to determine whether the primary significance of "The Cheerleading Worlds" term in the mind of consumers was Plaintiff rather than merely the service, a world championship event. Ex. 1 at 54:20– 56:5. That Plaintiff dragged this litigation out for years knowing it had no survey evidence or consumers ready to support secondary meaning and a likelihood of confusion confirms Plaintiff's unreasonableness and exceptionally weak claims. Indeed, it is clear this suit was "nothing but a thinly-veiled effort to stifle legitimate competition, competition that is legal under the law." *Vital Pharm., Inc.*, 510 F. Supp. 2d at 1052; *see also Pro Video Instruments, LLC*, 2021 WL 487020, at *5 (lack of reliable survey and dearth of evidence supporting claims raised "reasonably strong inference that Plaintiff sued Defendant as a competitive weapon rather than to redress a lawful harm").

### D.  Plaintiff sued the individuals for millions of dollars without proof.

Plaintiff sought to recover more than $40 million[9], plus treble damages, from each individual Defendant but failed to make a legally or factually supported argument about the commercial use element in its Lanham Act claim against those individuals. *See Renna*, 2015 WL 1815498, at *4 (awarding fees because plaintiff failed to put forward evidence that defendant used mark for a commercial purpose). Plaintiff sued each

---

[8] *See Vital Pharm., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1253 (S.D. Fla. 2021) (lack of survey weighs against secondary meaning); *Gulf Coast Commercial Corp. v. Gordon River Hotel Associates*, No. 2:05CV564-FTM-33SPC, 2006 WL 1382072, at *10-11 (M.D. Fla. May 18, 2006) (noting it is very difficult to prove secondary meaning without a survey); *see also Wag'N Enterprises, LLC v. United Animal Nations*, No. 1:11CV955 LMB/IDD, 2012 WL 1633410, at *8 (E.D. Va. May 9, 2012) (failure to submit a survey "weighs heavily" against a finding of infringement).
[9] "USASF claims that Defendants should be held jointly and severally liable for disgorgement, in the amount of approximately $40,516,743." Doc. 202 at 21-22.

individual for "doing business as" the "Allstar World Championship/Allstar Worlds" (Doc. 36 at 1) yet lacked evidence showing the individuals used the allegedly infringing marks for a commercial purpose in their individual capacities. Plaintiff effectively abandoned its separate claims against the individuals in response to the summary-judgment motion, merely asserting that the individuals used the marks on social media and in emails. (Doc. 182-1 at 18). But Plaintiff never showed any use by them for a commercial purpose in an individual capacity. *See St. Xavier Univ. v. Mossuto*, No. 20-CV-05206, 2023 WL 4901261, at *4 (N.D. Ill. Aug. 1, 2023) (defendant's use of social media in connection with goods and services not enough to show commercial use; awarding fees to defendant). Plaintiff's absolute failure to make a sincere attempt to establish an element of its claims against the individual Defendants further displays the unreasonableness of its case. *See IMAF, S.p.A. v. J.C. Penney Co. 810* F. Supp. 96, 100 (S.D.N.Y. 1992) (awarding fees in light of "absolute failure to make a sincere attempt validly to establish an essential element" of Lanham Act claim).

*     *     *

In the end, this case did not present a novel issue of law or materially disputed factual contentions. The absence of competent evidence probative of secondary meaning or relevant consumer confusion stemming from Defendants' alleged use of the term "world," accompanied by the lack of any effort by Plaintiff to perform formal research or obtain a survey expert to help show secondary meaning or confusion, further warrants a finding that this case is exceptional. *See Off Lease Only, Inc. v. Lakeland Motors, LLC*, No. 618CV1555ORL37DCI, 2020 WL 9455591, at *3 (M.D. Fla. June 30, 2020), aff'd, 846 Fed. Appx. 772 (11th Cir. 2021) (affirming summary judgment and Magistrate Judge Irick's

finding that case was "exceptional" when plaintiff's trademark claims were weak, survey found no secondary meaning, plaintiff had no counter-survey, and no evidence of harm).

### 2.  Plaintiff litigated this case in an unreasonable manner.

On top of having an exceptionally weak case, Plaintiff made matters worse by using unreasonably contentious litigation tactics that needlessly escalated the cost and burden to Defendants. The Court may also find this case exceptional based on Plaintiff's "manner of litigating [its] suit." *Tobinick*, 884 F.3d at 1113. Plaintiff's tactics included:

**Excessive Trial Exhibits**. Plaintiff designated more than 650 trial exhibits for a five-day trial, many of which were duplicative, cumulative, irrelevant, or clearly inadmissible. (Doc. 202-1). Plaintiff declined to cooperate in attempts to review and narrow Plaintiff's exhibit list to those it truly intended to possibly use at trial. Ex. 3 ¶3. Plaintiff's lack of diligence in filing a reasonable exhibit list resulted in Defendants dedicating substantial time to review and analyze each trial exhibit and prepare objections. This was avoidable, as it was impossible for Plaintiff to use each exhibit at trial given time constraints. For example, there was no realistic expectation that Plaintiff would use the more than 60 videos included in its list, most of which had no relevance. Even so, Defendants had to review and analyze each video and prepare objections. Although it is understandable for Plaintiff to be cautious, Plaintiff crossed the line and unnecessarily added to the already burdensome task of reviewing, analyzing, and objecting to Plaintiff's trial exhibits.

**Excessive Witness Designations.** Plaintiff made unreasonable witness designations. For example, Plaintiff designated Amie Allen as a trial witness and claimed she had knowledge about actual confusion. When Defendants' counsel contacted Ms. Allen, she advised that she had no idea who Plaintiff was and had not spoken to anyone

else about the case. Ex. 3 ¶4-8. Plaintiff also listed Adria Noecker as a witness, but never provided her full contact information. Only a phone number was given for an automated answering machine asking for an extension. Ex. 3 ¶5.  Either Plaintiff withheld Ms. Noeckers's full contact information or never spoke with her, yet still chose to list her as a witness with knowledge. Defendants' counsel had to spend much time trying to find these witnesses even though it is now obvious Plaintiff had no intention of calling them to testify.

**Excessive Deposition Designations.** Plaintiff's over-designation of deposition testimony for trial unnecessarily increased costs. The deposition designations take up about 100 pages (Doc. 202-5 and 202-6). Although Plaintiff is entitled to make designations, its pre-trial strategy created considerable work for Defendants. It resulted in Defendants having to review for objections and counter-designations for witnesses that would be present at trial. In addition, Plaintiff designated deposition testimony from an entirely separate lawsuit even though Defendants' counsel was not provided a copy of the deposition transcripts during discovery. Ex. 3 ¶9. When Plaintiff did provide copies of the deposition testimony, there were many redactions, which deprived Defendants of a fair opportunity to make cross-designations. Plaintiff never provided complete, unredacted deposition transcripts for each witness. For example, Plaintiff made deposition designations for a third party, Josh Quintero, from another lawsuit that was subject to a protective order. Defendants' counsel were not part of that case and could not reasonably know what was redacted. Ex. 3 ¶9.

**Unreasonable Gamesmanship.** Plaintiff tried to improperly exploit the dismissal of mislabeled "affirmative defenses." When Plaintiff complained about the pleading sufficiency of certain affirmative defenses raised in Defendants' answer, Defendants

chose not to waste the Court's time with unnecessary motions practice. They agreed to dismiss the antitrust defenses (antitrust claims were filed elsewhere) and the wrongly labeled "affirmative defenses" merely challenging the basic elements of Plaintiff's claims. Plaintiff knew Defendants still disputed the basic elements of Plaintiff's claims. For example, Defendants had a survey showing a complete lack of secondary meaning that Plaintiff was still trying to contest. Yet Plaintiff took advantage of Defendants' good-faith cooperation by arguing that Defendants could effectively no longer challenge the basic elements of Plaintiff's claims, which unnecessarily drove up Defendants' costs. Such gamesmanship was an unfortunate distraction. Defendants' good-faith cooperation was wrongly used by Plaintiff as a tactic to gain an undue advantage in the case.

**Unreasonable Failure to Investigate Claims.** Plaintiff conducted no pre-filing investigation and failed to exercise due diligence before and after suing. *See* Ex. 1 at 54:20–56:5. An adequate investigation would have revealed how weak its claims were. *See Florida Int'l Univ. Bd. of Trustees*, 2017 WL 3610583, at *4 (exceptionality established by failure to conduct investigation). Indeed, Plaintiff's own 30(b)(6) witness could not back up Plaintiff's serious allegations. For example, Plaintiff insisted that social media posts showed confusion. Yet Plaintiff's 30(b)(6) witness hadn't reviewed any social media posts before his deposition. Ex. 1 at 101:16-23. The witness also confirmed he had no information about Ms. Allen or Ms. Noecker, the witnesses discussed above that allegedly could testify about confusion. Ex. 1 at 97:8– 98:6. When the 30(b)(6) witness was asked about many of the documents Plaintiff claimed proved confusion, he generally didn't know why they were included or could only guess as to what the documents showed. *See* Ex. 1 at 67:1– 68:5.

**Unreasonable Flip-Flopping on Damages.** During discovery, Plaintiff resisted producing documents showing any actual harm or financial injury (because there was none) and then represented that it was not seeking actual damages. *See* Doc. 192. Based on Plaintiff's representation, Defendants filed papers with the Court advising that Plaintiff had forfeited any claim for actual damages.[10] After those filings in December 2023, Plaintiff did not try to contact Defendants or file anything to correct any purported misunderstanding. Rather, it was only after Defendants moved to strike Plaintiff's jury demand that Plaintiff began to insist that it was still seeking millions in actual damages (Doc. 183), including for an unspecified amount of "corrective advertising," loss of goodwill, and reputational harm.

**Unreasonable Flip-Flopping on Claims Against the Individual Defendants.** In its Amended Complaint, Plaintiff asserted that Defendants Owens, Weber, Harris, and Hanbery each committed trademark infringement as individuals, were together doing business as "Allstar World Championship/Allstar Worlds," and were guilty of conspiring with each other by each using the allegedly infringing marks. Doc. 36 at 1, 22-23. Plaintiff then argued it was entitled to recover more than $40 million from each Defendant, jointly and severally. Defendants moved for summary judgment based on the absence of evidence that the individual defendants were "d/b/a Allstar World Championship/Allstar Worlds" and personally using the marks for a commercial purpose on their own. Having no evidence supporting Plaintiff's accusation against the individuals, Plaintiff tried arguing that it was really only suing the individual defendants based on their actions as managers

---

[10] Doc. 143 at 1 and Doc. 144 at 1: "After filing this case, Plaintiff forfeited any claim for actual damages (presumably because it has none). Plaintiff now only seeks equitable remedies—injunctive relief and disgorgement of Defendants' profits."

of the Open Cheer entities. But that claim was not raised in its Amended Complaint and contradicts Plaintiff's conspiracy claim. This caused attorneys' fees to go even higher because of additional briefing and preparation for trial.

**Unreasonable Discovery Demands.** Plaintiff made onerous discovery demands. Although the case involved just two marks, it resulted in 18 depositions (including five expert witnesses), more than 40 third-party subpoenas, nearly 100 interrogatories to Defendants, 167 requests for admission to Defendants, and more than 25,000 pages of records produced. Ex. 3 ¶10, 12-13; Ex. 3-C; Ex. 3-D. Defendants' accountant was forced to dedicate more than 300 hours searching for and compiling thousands of pages of documents related to Defendants' finances. Ex. 4. She also spent much time creating documents and breaking down financial information to satisfy Plaintiff's counsel demands. Rather than try to minimize the cost associated with this process, Plaintiff forced Defendants to spend as much time and money as possible during discovery. Plaintiff did not limit its discovery requests to the events at issue, but also used discovery to learn as much as possible about other third-party businesses and individuals. *See* Ex. 3-C. The fear throughout was that Plaintiff was using discovery merely as a tool to learn about its competitors' internal operations.

**Unreasonable Response to Summary Judgment Motion.** Plaintiff submitted a massive set of documents in response to the summary-judgment motion, which reflected a transparent attempt to manufacture disputed facts where none existed. Of the 132 exhibits, many were either irrelevant, lacked probative value, or had no chance of being admissible at trial. Exhibits were offered without affidavits or declarations explaining why they created a fact issue. And Plaintiff failed to direct the Court to specific exhibits and

16

testimony to sufficiently explain why they created a fact issue on each challenged element.

**Unreasonable Refusal to Acknowledge Other Potential Causes of Harm.** Whether true or not, Plaintiff is facing many sexual abuse allegations and related lawsuits. Doc. 173-3 at 444. But Plaintiff never considered how such allegations and lawsuits impacted its brand. Ex. 2 at 254:2– 255:9. This was unreasonable. Plaintiff should not have tried to use this case as a vehicle to pursue millions for loss of goodwill and reputational harm while refusing to consider the effect of the widely publicized allegations.

**Unreasonable Allegations of "Irreparable Injury."** Plaintiff unreasonably continued to insist that it was suffering irreparable injury yet never sought temporary relief. Plaintiff's own inaction belied its claim that it ever faced irreparable harm. *See Real-Time Reporters, P.C. v. Sonntag Reporting Services, Ltd.*, No. 13 C 5348, 2013 WL 5818460, at *1 (N.D. Ill. Oct. 29, 2013) (denying motion for preliminary injunction in trademark infringement case because plaintiff waited to file motion, which belied any claim of irreparable harm); *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006). Indeed, Plaintiff learned of the ASWC by at least December 2020, waited a year to sue, and then never sought a temporary injunction. If Plaintiff truly suffered harm or there was risk of actual confusion, then Plaintiff would have sought relief immediately. That Plaintiff chose not to even pursue preliminary relief, further shows just how weak its claims were.

The apparent aim was to have Defendants continue doing all the work for the ASWC and roll the dice in this case. Plaintiff had little to lose while waiting for a trial. If it lost, things stayed the same. On the other hand, by dragging this litigation out and allowing the revenue at issue to increase, Plaintiff might force a favorable settlement. "[A]n award

of costs and fees is crucial here, so as to deter this plaintiff, and other similarly situated plaintiffs, from bringing unreasonable claims based on a cost/benefit analysis that tells such plaintiffs that they can score big if they win and that there will be no adverse consequences if they lose." *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 359 (S.D.N.Y. 2006), aff'd, 249 Fed. Appx. 845 (2d Cir. 2007).

*     *     *

In sum, Plaintiff's litigation conduct went far beyond zealous advocacy and veered into the unreasonable use of litigation tactics that needlessly expanded the scope of the proceedings and unnecessarily drove up Defendants' costs. While not an exhaustive list, these tactics evince a pattern of unreasonably costly and contentious conduct. Even if each individual action "may not have been 'exceptionally' unreasonable, the totality of the circumstances of the present action are indicative of the type of 'exceptional case' that justifies an award of fees." *See Joao Bock Transaction Sys., LLC v. Jack Henry & Associates, Inc.*, No. CV 12-1138-SLR, 2016 WL 1267159, at *3 (D. Del. Mar. 31, 2016), aff'd, 714 Fed. Appx. 1019 (Fed. Cir. 2018). Such conduct that served to needlessly increase the cost and scope of this litigation is troubling and should be recognized as standing out from other trademark cases. The lack of investigation, the lack of damages, the legal impediments to bringing this case, and the unreasonable litigation conduct are more than enough to support a finding that this case is exceptional.

### 3. Plaintiff used this lawsuit as a "competitive ploy."

Adding to the unreasonableness of this case, Plaintiff's complaint was based not on concern for trademark confusion but on fear for their competitive position in a market where it had grown used to total control. *See Sazerac Co. v. Fetzer Vineyards, Inc.*, No.

18

3:15-CV-04618-WHO, 2017 WL 6059271, at *1 (N.D. Cal. Dec. 7, 2017), aff'd, 786 Fed. Appx. 662 (9th Cir. 2019) (plaintiff "acted out of a desire to protect what it perceived as a potential loss of control" but had no evidence that its goodwill was undermined, its brand diminished, or its consumers confused). That Plaintiff's motivation for bringing this lawsuit was to shut down a competitor awarding a "world champion" title also justifies an award of attorneys' fees. *See Vital Pharm., Inc. v. Am. Body Bldg. Products, LLC*, 510 F. Supp. 2d 1043, 1047 (S.D. Fla. 2007) (anti-competitive animus by plaintiff may qualify as bad faith); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530 (2d Cir. 2018).

For example, Plaintiff's unreasonable demand of millions of dollars in loss of goodwill, reputational harm, and "corrective advertising" confirm Plaintiff's improper motive. *Reply All Corp. v. Gimlet Media, Inc.*, No. 15CV4950WFKPK, 2021 WL 1291103, at *3 (E.D.N.Y. Apr. 5, 2021) ("increasingly tortured attempts to create a viable damages theory indicate bad faith and extortionary motives"). As previously briefed and discussed (*see* Doc. 192), Plaintiff told Defendants during discovery it was not seeking actual damages, but then did an about-face. Even so, Plaintiff never explained how it calculated its supposed loss of goodwill and "corrective advertising" damages and didn't provide all records showing the amount of harm allegedly suffered or corrective advertising allegedly expended.

Plaintiff's damages theories became increasingly far-fetched as the case progressed, as it did not identify any expert testimony and trial exhibits to support corrective advertising damages or any loss of goodwill damages. None of Plaintiff's advertising sought to "correct" any alleged acts of trademark infringement or reinforce that Plaintiff and Open Cheer are separate organizations – in fact, it does not appear that any of Plaintiff's advertisements even mentioned Open Cheer or the ASWC. *See* Ex. 2 at 227:8-

11. Instead, Plaintiff's 30(b)(6) testimony was that it spent more money in the promotion of its event to make sure that it was "living up to the standards that we needed to live up to." Ex. 2 at 227:12-24. When pressed on the issue, Plaintiff's testimony was that it would have to pull old reports to find out how much had been spent, which was when Plaintiff's counsel advised on the record that Plaintiff was not seeking actual damages. Ex. 2 at 229:3– 230:24. Plaintiff also never analyzed whether it suffered any harm caused by the many sexual abuse allegations and antitrust lawsuits that were widely publicized. *See* Ex. 2 at 250:21– 255:9. No attempt was made to distinguish what harm might have resulted from the sexual abuse allegations in comparison to the alleged trademark infringement. Ex. 2 at 254:24– 255:9.

Plaintiff's improper motivations are further shown by its ongoing anti-competitive campaign to boycott Open Cheer. *See* Doc. 170-3 at 463-464. Open Cheer and another event production company have sued Plaintiff for its illegal boycott. Ex. 3 ¶11; Ex. 3-A. Plaintiff's efforts to dismiss the case were rejected. Ex. 3-B. Plaintiff's alleged anti-competitive actions, if proven to be true, are per se illegal. That Plaintiff still refuses to allow members to do business with Open Cheer confirms an improper motive. Likewise, Plaintiff's aim with this lawsuit was to destroy Defendants' businesses. Not only did Plaintiff wish to stop the ASWC, but it also wanted the Court to order Defendants to keep a "safe distance" from the industry (*See* Doc. 202 at 36) and prohibit anyone else from using the "world champion" title. *See* Doc. 170-3 at 42-44. This also demonstrates an improper motive.

In sum, Plaintiff's weak claim, unreasonable demands, and lack of evidence raises a strong inference that Plaintiff filed this suit as a competitive ploy. *See Pro Video*

*Instruments, LLC*, 2021 WL 487020, at *5 (plaintiff's weak claim and flawed survey raised a strong inference that plaintiff sued defendant as a "competitive weapon rather than to redress a lawful harm"); *Sleepy's LLC*, 909 F.3d at 530; *see Vital Pharm., Inc. v. Am. Body Bldg. Products, LLC*, 510 F. Supp. 2d 1043, 1048 (S.D. Fla. 2007) (plaintiff's motivation in bringing suit may make it exceptional).

### 4.  Awarding fees will advance considerations of compensation and deterrence.

An award reimbursing Defendants for their defense fees will also advance considerations of compensation and deterrence. This lawsuit has been extremely expensive and contentious. Plaintiff's lawsuit forced Defendants, a group of individuals who had just started new companies to offer an alternative choice in the industry, to incur enormous expense and attention that could have been devoted to serving their mission of developing competitions and opportunities for youth. Having to defend against such huge claims against a major company like Plaintiff was a daunting challenge and caused Defendants to incur staggering costs for a small business just starting out.

Congress permitted an award of attorneys' fees under the Lanham Act because trademark cases "present a particularly compelling need for attorney fees." S. Rep. No.93-1400, at *7136 (1974). That is because, among other reasons, the expense of litigating intellectual-property claims, especially against a much larger corporation, "is often staggering to the small businessman." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971) (citation omitted) (explaining that an alleged infringer may just accept a license rather than have to defend "an expensive infringement action during the period when he may be least able to afford one").

This case is particularly worthy of compensation and deterrence because the relief sought by Plaintiff was not simply millions in damages against the Open Cheer entities, but also against the individual defendants (a judgment that could bankrupt them). Moreover, Plaintiff unreasonably sought an injunction declaring that any use by Defendants of the word "world" alone in connection with an all star competition be deemed infringing. Such combined threats—effectively demanding that Open Cheer cease offering its world championship event, shut down the business, and pay USASF every cent earned from Defendants' hard work over the years—is the exact kind of sharp tactic, extreme in outcome and unwarranted by law or facts, that the Court should deter.

Allowing Plaintiff a simple walk-away would have no deterrent effect. Defendants in a case like this should be rewarded in the form of attorneys' fees as a matter of policy and to deter large corporations from prosecuting infirm trademark infringement claims and seeking millions in damages without evidence of financial loss (such as a consumer buying the wrong product or service).[11] Defendants took on the biggest "membership" corporation in the industry with much greater resources (backed by Varsity, which was reportedly just bought for nearly **$5 billion**). Plaintiff was represented by many lawyers from one of the largest firms in the United States and wanted to crush Defendants. That this was a "David and Goliath" matchup also shows this case was "exceptional."

---

[11] *See Leading Edge Mktg. Inc. v. Individuals, Partnerships & Unincorporated Associations Identified on Schedule "A"*, No. 21-23480-CIV, 2022 WL 16756952, at *5 (S.D. Fla. Nov. 7, 2022) (awarding fees serves important function of compensating prevailing party for their fees); *Benihana of Tokyo, LLC v. Benihana, Inc.*, No. 14 CIV. 224 (PAE), 2018 WL 3574864, at *11 (S.D.N.Y. July 25, 2018), aff'd, 771 Fed. Appx. 71 (2d Cir. 2019) (awarding defendant fees when required "to expend significant resources investigating . . . and defending against claims").

**5.  Defendants should also be awarded their related nontaxable expenses.**

The Court's award of attorneys' fees should include related nontaxable expenses incurred. Rule 54(d) permits a party to include in a motion for attorney fees a request for its "related nontaxable expenses." Fed. R. Civ. P. 54(d)(2)(A). Courts have included such nontaxable expenses as part of an attorneys' fee award under § 1117(a) where a case is "exceptional." *Ferrara Candy Co. v. Exhale Vapor LLC*, No. 217CV512FTM38MRM, 2018 WL 6261504, at *6 (M.D. Fla. July 30, 2018); *Dropbox, Inc. v. Thru Inc.*, No. 15-CV-01741-EMC, 2017 WL 914273, at *5 (N.D. Cal. Mar. 8, 2017), aff'd, 728 Fed. Appx. 717 (9th Cir. 2018); *Domond v. PeopleNetwork APS*, No. 16-24026-CIV, 2017 WL 5642463, at *4 (S.D. Fla. Nov. 14, 2017), aff'd, 750 Fed. Appx. 844 (11th Cir. 2018).

Defendants' nontaxable expenses related to their defense of this action include: (1) travel and accommodations for hearings; (2) online research; (3) photocopying; (4) PACER fees; (5) mediator fees; (6) electronic document hosting, processing, and related fees; (7) other litigation-related expenses. For example, in *Dropbox*, the court awarded the prevailing party in the Lanham Act action more than $400,000 for its nontaxable e-vendor discovery expenses because such expenditures "were necessary given the large volume of discovery in this case; the costs were largely related to hosting the voluminous documents produced by [the non-prevailing party], as well as to reviewing Dropbox's documents for privilege and responsiveness." 2017 WL 914273, at *6. So too here, the volume of electronic discovery was large, including as a result of the expense of hosting electronic document productions and Plaintiff's demand that Defendants (and other third parties) collect, electronically search, and produce a large volume of documents.

**6. Defendants should be granted leave to file a fee application detailing its requested attorneys' fees and related nontaxable expenses.**

If the Court finds this to be an "exceptional" case, Defendants also respectfully ask that the Court set a date by which Defendants submit a fee application setting forth the specific calculations of Defendants' requested attorneys' fees and related nontaxable expenses, with appropriate supporting documentation. *See* Fed. R. Civ. P. 54 (1993 Adv. Comm. Notes) (motion must merely alert the adversary and the court that there is a claim for fees and a fair estimate of the amount of such fees). This two-stage process of first ruling on the threshold matter of whether a case satisfies the "exceptional case" requirement and then, if granted, addressing a particularized fee application, is well established. *Pro Video Instruments, LLC*, 2021 WL 487020, at *5; *Florida Int'l Univ. Bd. of Trustees*, 2017 WL 3610583, at *8; *Donut Joe's, Inc.*, 116 F. Supp. 3d at 1295.

Defendants' fair estimate of attorneys' fees sought is approximately $828,229.95, and a fair estimate of the amount of related nontaxable expenses sought is approximately $12,499.59. *See* Fed. R. Civ. P. 54(d)(2)(B)(iii).[12] If given leave to file it, Defendants' fee application will be supported with appropriate documentation, including demonstration that the hourly billing rate for Defendants' attorneys, and the number of hours billed, are reasonable. It will also comply with Local Rule 7.01(c).

---

[12] Defendants seek, and this Court should include in its ultimate award, Defendants' fees incurred in bringing the current motion and their forthcoming fee application. *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 123 F. Supp. 2d 582, 587 (D. Kan. 2000) (awarding fees under § 1117(a), including "for work performed in presenting and preparing the fee application"). Defendants' fee estimate includes their reasonable estimate for preparing this motion and reply, and their fee application. Defendants reserve the right to amend their estimate should additional information become available.

## Conclusion

"In sum, the patent weakness of Plaintiff's case, together with its unreasonable litigation conduct, makes this an extraordinary case warranting the award of attorney fees under the Lanham Act." *Pro Video Instruments, LLC*, 2021 WL 487020, at *5. Accordingly, for the reasons stated above, Defendants respectfully ask that the Court find this to be an exceptional case for which Defendants are entitled to their attorneys' fees and related nontaxable expenses, and allow Defendants to submit a fee application setting forth and supporting its specific calculations of such fees and expenses.

### Local Rule 3.01(g)  Certification

Undersigned counsel certifies that counsel for parties of record have conferred about the relief requested in the motion and Plaintiff opposes the relief requested.

Dated: August 1, 2024                Respectfully submitted,

John Smithee (TX Bar No. 24098449)        Bryan D. Hull (Florida Bar No. 020969)
John.Smithee@uwlaw.com                     bhull@bushross.com
W. Wade Arnold (TX Bar No. 00783561)       **BUSH ROSS, P.A.**
Wade.Arnold@uwlaw.com                      1801 North Highland Avenue, P.O. Box 3913
**UNDERWOOD LAW FIRM, P.C.**                Tampa, Florida 33601-3913
500 S. Taylor, Suite 1200                  Tel: (813) 224-9255
Amarillo, Texas 79101
Tel: (806) 376-5613; Fax: (806) 379-0376

By:     */s/ John Smithee*
        **Attorneys for Defendants**

### Certificate of Service

Undersigned counsel certifies that on August 1, 2024, all counsel of record who consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ John Smithee*
John Smithee